IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

      :

CAPITAL FINANCE, LLC

      :

          Plaintiff,

      :

    v.                        Case No. 1:16-cv-02760-ELH

      :

HIGHLANDS OF HEBER SPRINGS, LLC,
  et al.                      :   Jury Trial Requested

          Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

HIGHLANDS OF HEBER SPRINGS, LLC,
  et al.                      :

      :

         Defendants/Counter-Plaintiffs,
  and                      :

HIGHLANDS OF ARKANSAS, LLC     :
2 Office Park Circle, Suite 110
Mountain Brook, AL 35223-2509     :

  and                      :

ARIA HEALTH GROUP, LLC       :
2 Office Park Circle, Suite 110
Mountain Brook, AL  35223-2509    :

        Additional Counter-Plaintiffs.  :

    v.                      :

CAPITAL FINANCE, LLC         :

        Plaintiff/Counter-Defendant,  :

  and                      :

      :

CFG COMMUNITY BANK                              :
1422 Clarkview Road
Baltimore, MD  21209                            :
(Baltimore County)
                                                :
  and
                                                :
CAPITAL FUNDING GROUP, INC.
1422 Clarkview Road                             :
Baltimore, MD 21209
(Baltimore County)                              :

  and                                 :

CAPITAL SENIOR VENTURES, LLC                    :
1422 Clarkview Road
Baltimore, MD 21209                             :
(Baltimore County)
                                                :
  and
                                                :

ADDIT, LLC d/b/a COMPASS POINTE                 :
  HEALTHCARE SYSTEM
6300 Blair Hill Lane                            :
Baltimore, MD  21209
                                                :
  and
                                                :
JOHN W. ("JACK") DWYER
1422 Clarkview Road                             :
Baltimore, MD 21209
(Baltimore County)                              :

  and                                 :

GLEN DWYER                                      :
1422 Clarkview Road
Baltimore, MD 21209                             :
(Baltimore County)
                                                :
  and
                                                :

                                                :

2

JEFFREY STEIN                                        :
1422 Clarkview Road
Baltimore, MD 21209                                  :
(Baltimore County)
                                                     :

  and                                                :

BRIAN REYNOLDS                                       :
1422 Clarkview Road
Baltimore, MD 21209                                  :
(Baltimore County)
                                                     :

        Additional Counter-Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    X

## COUNTERCLAIM

Defendants/Counter-Plaintiffs, Highlands of Heber Springs, LLC, Highlands of McGehee, LLC, Highlands of Harrison Orendorf, LLC, Highlands of Harrison Tims, LLC, Highlands of Rogers, LLC, Highlands of Van Buren, LLC, R. Denny Barnett and Blaine G. Brint, and Additional Counter-Plaintiffs Highlands of Arkansas, LLC, and Aria Health Group, LLC, bring this Counterclaim against Plaintiff/Counter-Defendant Capital Finance, LLC, and against Additional Counter-Defendants, CFG Community Bank, Capital Funding Group, Inc., Capital Senior Ventures, LLC, Addit, LLC d/b/a Compass Pointe Health Care Systems, John W. ("Jack") Dwyer, Glen Dwyer, Jeffrey Stein and Brian Reynolds, and state that:

## OVERVIEW

1.      CFG Finance, LLC, Plaintiff and Counter-Defendant, has brought the present action on a credit and security agreement and promissory notes that were part of a single transaction that occurred at the end of 2013 and was dated as of January 1, 2014. The transaction was orchestrated by John W. "Jack" Dwyer, to divest six skilled nursing facilities in Arkansas that he indirectly owned and controlled. Dwyer and his wholly-owned entities were under pressure to

be rid of the nursing facilities by the end of 2013 to avoid repaying as much as $2 million in Medicaid reimbursements that his companies would otherwise owe to the State of Arkansas. Transfer of the nursing homes would also allow Dwyer's companies to receive from the new owners approximately $1.75 million that Dwyer had previously escrowed for future rent and capital expenditures.

2.      As shown in the credit and security agreement attached to the Complaint, the credit and security agreement was only one of five groups of agreements that were executed simultaneously as part of a single transaction. They were: (i) lease assignment and sublease agreements; (ii) operations transfer agreements; (iii) administrative services agreements; (iv) bank depository and depository control agreements; and (v) the credit agreement, notes and personal guarantees. All of these agreements were with entities owned, directly or indirectly, by Jack Dwyer, and each of the agreements was conditioned on the execution of all the others.

3.      The Counter-Defendants are Jack Dwyer, the Dwyer-controlled entities that engaged in the transaction and the individual senior employees of those entities that brought it about. The Counter-Defendants induced the Counter-Plaintiffs to enter into the transaction by means of fraud and deceit. From the outset, the Counter-Defendants insisted that an essential element of the transaction was that the Counter-Plaintiffs agree to hire one of their entities Addit, LLC ("Addit"), to perform all the billing, collections, accounting, budgeting, financial reporting and government filings for the nursing facilities. The Counter-Defendants insisted that Addit possessed invaluable information about the six Arkansas facilities, that Addit was knowledgeable about the Arkansas regulatory requirements, and that Addit would assure that the transition to the Counter-Plaintiffs would be seamless and effortless.

4

4.    The Counter-Defendants knew, but concealed from the Plaintiffs, that they were about to uproot Addit from its Indianapolis headquarters and move it to temporary headquarters in Baltimore where it would be entirely reorganized.  Addit was to be combined with five or six other similar entities, that would do business as Compass Pointe and would integrate their personnel and integrate their diverse information technology systems.  These dramatic changes in Addit's business would occur at the same time that the Counter-Defendants would be taking over the nursing facilities.  The Counter-Defendants knew that there was a high risk and a distinct probability that Addit's move and reorganization would disable Addit from providing the services necessary for operation of the nursing facilities' businesses and compliance with Arkansas law.

5.    The Counter-Plaintiffs did not learn of Addit's move and reorganization until after the Counter-Plaintiffs had consummated the transaction and acquired ownership of the six Arkansas nursing facilities.  As the Counter-Defendants would reasonably have anticipated, the relocation and reorganization of Addit was an unmitigated disaster.  Key employees repeatedly passed through a revolving door, and Addit's complex efforts to integrate the diverse operations and information systems distracted and prevented Addit from performing the services it had promised to the Counter-Plaintiffs.  Addit failed to bill and collect for the nursing facilities' services and failed to provide the accounting, budgeting, reporting, governmental reporting and back office services that it had contracted to perform.

6.    Seventy-five percent of the nursing facilities' revenue consisted of Medicaid reimbursements.  Under the Arkansas Medicaid system, the nursing facilities were required to file timely cost reports to maintain profitable reimbursement rates.  Despite repeated requests by the Counter-Plaintiffs,  Addit utterly failed to record, maintain and provide the information necessary for the filing of cost reports.  Arkansas imposed fines on the nursing facilities for the failures to

file the cost reports.  In April 2009, after the cost reports were six months delinquent, Arkansas, as a further penalty, lowered its reimbursement rates to the lowest rate payable under the Medicaid program.  This action reduced the nursing facilities' Medicaid cash flow by more than 25%.  While the rate reduction could be cured by filing the delinquent cost reports, and Counter-Plaintiffs requested that Addit do so, Addit nevertheless, failed to provide the cost information.  The Counter-Defendants ultimately admitted that Addit had never gathered or maintained the information.

7.    To accomplish the objective of benefiting Jack Dwyer in his nursing facility endeavor, the Counter-Defendants conceived and effectuated the agreements that form the transaction through self-dealing and misuse of the facilities of CFG Community Bank, a state-chartered, federally issued bank indirectly owned by Dwyer through a holding company.  The Counter-Defendants caused the Bank, its Affiliate (Plaintiff and Counter-Defendant Capital Finance) and other institution-affiliated parties (including Addit) to engage in illegal tying agreements, in violation of 12 U.S.C. § 1972, for which the Counter-Defendants are liable, under 12 U.S.C. § 1975, for treble damages, cost of suit and attorney's fees.  The tying agreements were extraordinary and inappropriate banking practices because, among other things, they were in breach of fiduciary duties owed to the Bank, were undertaken for the primary purpose of providing pecuniary gain and other benefits to Dwyer and other institution-affiliated parties and violated principles prohibiting conflicts of interest and self-dealing.

8.    As a direct and proximate result of the Counter-Defendants' tortious conduct, breaches of contract and violations of banking laws, the Counter-Defendants sustained actual losses and damages amounting to more than $15 million.  The Counter-Plaintiffs were forced into a situation in which the success or failure of their business depended upon the performance of the

vital accounting and back office services by a Dwyer-controlled entity that was incapable or unwilling to perform them.  The Counter-Defendants lost significant portions of their revenue stream, resulting in the accumulation of a mountain of debt and the inability to function.  On December 1, 2015, as demanded by the Counter-Defendants, the Counter-Plaintiffs transferred the six Arkansas nursing facilities to a new operator.

## PARTIES

### Counter-Plaintiffs

9.      Defendants/Counter-Plaintiffs Highlands of Heber Springs, LLC Highlands of McGehee, LLC, Highlands of Harrison Orendorf, LLC, Highlands of Harrison Tims, LLC, Highlands of Rogers, LLC, and Highlands of Van Buren, LLC, are each a Delaware limited liability company in good standing.  Each maintains its principal place of business at 2 Office Park Circle, Suite 110, Mountain Brook, Alabama.  Each is a single purpose entity that was created to acquire and operate one of six Arkansas skilled nursing facilities.  They are described herein collectively as the "Highlands Nursing Facility Entities."

10.      Counter-Plaintiff Highlands of Arkansas, LLC, is a Delaware limited liability company in good standing.  It is the sole member of each of the Highlands Nursing Facility Entities.  It maintains its principal place of business at 2 Office Park Circle, Suite 110, Mountain Brook, Alabama.  Its members are Defendants/Counter-Plaintiffs R. Denny Barnett ("Barnett") and Blaine G. Brint ("Brint") and Charlotte Pierce.  Pierce, a natural person, is a resident, domiciliary and citizen of Mississippi.

11.      Counter-Plaintiff Aria Health Group LLC ("Aria") is a Delaware limited liability company in good standing.  It maintains its principal place of business at 2 Office Park Circle,

Mountain Brook, Mississippi. Defendant and Counter-Plaintiff Barnett is its owner. Aria manages health care facilities and was manager of the Highlands Nursing Facility Entities.

12.    Defendant/Counter-Plaintiff Barnett is a citizen and domiciliary of Florida.

13.    Defendant/Counter-Plaintiff Brint is a citizen and domiciliary of Alabama.

14.    The Defendants/Counter-Plaintiffs and the additional Counter-Plaintiffs are sometimes referred to herein, collectively, as "Highlands Parties."

**Counter-Defendants**

15.    Plaintiff/Counter-Defendant Capital Finance, LLC ("Capital Finance") is a Maryland limited liability company with its principal place of business at 1422 Clarkview Road, Baltimore, Maryland 21209. It is a wholly owned subsidiary of Capital Funding Bancorp, Inc. ("Capital Bancorp"), a registered bank holding company. Jack Dwyer is the sole owner of Capital Bancorp.

16.    Additional Counter-Defendant CFG Community Bank ("CFG Bank") is a wholly owned subsidiary of Capital Bancorp. CFG Bank and Capital Finance are affiliates of one another. Jack Dwyer is Chairman of CFG Bank.

17.    Additional Counter-Defendant Capital Funding Group, Inc. ("Capital Funding Group") is a Maryland corporation with its principal place of business at 1422 Clarkview Road, Baltimore, Maryland 21209. Jack Dwyer is its Chairman and sole owner. Capital Funding Group holds itself out as the entity through which Jack Dwyer "provides full-service financing, investing and advisory solutions all under one roof." Capital Funding Group also holds out CFG Bank as its "affiliate." Capital Funding Group and others do business under the trade name "Capital Funding Group." That trade name is not now, and never has been, registered to or by Capital Funding Group.

18.    Additional Counter-Defendant Capital Senior Ventures, LLC ("Capital Senior Ventures") is a Maryland limited liability company with its principal place of business at 1422 Clarkview Road, Baltimore, Maryland 21209.  Jack Dwyer is its Chairman and sole owner.

19.    Additional Counter-Defendant Addit LLC ("Addit") is an Indiana limited liability company with its principal place of business at 6300 Blair Hill Lane, Baltimore, Maryland 21209, across the street from the Capital Funding Group.  Addit has, at some times relevant hereto, done business as Compass Pointe Healthcare Systems ("Compass Pointe").  Jack Dwyer owns the controlling interest in Addit directly or indirectly.  Addit provides management and back office services for skilled nursing facilities and healthcare facilities, primarily those owned and/or controlled by Jack Dwyer.  Addit holds itself out as "affiliated with Capital Funding Group."

20.    Additional Counter-Defendant Jack Dwyer, a natural person, is a resident and citizen of Maryland.  At all relevant times, as shown on the Capital Funding Group website, Jack Dwyer has been Chairman and sole owner of the entire family of entities (collectively the "CFG Entities") that include Capital Funding Group, Capital Senior Ventures, Capital Bancorp, and its subsidiaries CFG Bank and Capital Finance.  He has also been the controlling owner, directly or indirectly, of Addit and of a variety of skilled nursing facilities, including the Arkansas skilled nursing facilities at issue in this case.

21.    Additional Counter-Defendant, Glen Dwyer, a natural person, is a resident and citizen of Maryland.  At all relevant times, Glen Dwyer has been: (1) an employee and agent of Capital Funding Group; and (2) an agent of the entities through which Jack Dwyer owned and controlled the six Arkansas skilled nursing facilities, including Capital Senior Ventures, SLC Operations Master Tenant, LLC, CSCV Holdings, LLC, Arkansas SNF Operations Acquisition, LLC, and each of the single purpose entities created for each of the six nursing facilities

(collectively the "Capital Arkansas Entities").  At all relevant times, Glen Dwyer took the actions and made the statements, representations and concealments described in this Counterclaim individually and as agent of each of these entities and persons and within the scope of his authority as such agent.

22.    Additional Counter-Defendant Jeffrey Stein ("Stein"), a natural person, is a resident and citizen of the State of Maryland.  At all relevant times, Stein has been: (1) an executive and agent of Capital Finance; and (2) an agent of the Capital Arkansas Entities.  At all relevant times, Stein took the actions and made the statements, representations and concealments described in this Counterclaim individually and as agent of each of these entities and within the scope of his authority as such agent.

23.    Additional Counter-Defendant Brian Reynolds ("Reynolds"), a natural person, is a resident and citizen of Maryland.  At all relevant times, Reynolds has been: (1) an executive and agent of Capital Funding Group; (2) an executive, principal and agent of Capital Senior Ventures; (3) Manager of each of the Capital Arkansas Entities; and (4) Chairman, Vice-President, Manager and agent of Addit d/b/a Compass Pointe.  At all relevant times, Reynolds took the actions and made statements, representations and concealments described in this Counterclaim individually, and as agent of each of these entities and within the scope of his authority as such agent.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction because the Counterclaim is between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.    This Court also has original jurisdiction under 28 U.S.C. § 1331 because the Counterclaim presents federal questions and, therefore, arises under the laws of the United States. Specifically, and as alleged more fully below, CFG Bank, Capital Finance, Addit, and others have engaged in prohibited banking tying arrangements in violation of 12 U.S.C. § 1972 that have caused injury to Counter-Plaintiffs, and, as a result, Counter-Plaintiffs assert causes of action pursuant to 12 U.S.C. § 1975.

26.    This District is a proper venue pursuant to 28 U.S.C. § 1391(b)(2), because, as averred below, a substantial part of the events or omissions giving rise to the Counterclaim occurred in this District. Further, Counter-Plaintiffs assert causes of action based on a credit and security agreement and revolving loan notes that were only part of a transaction, and the Counterclaim is based on other contemporaneous agreements and conduct of the Counter-Defendants that were part of the same transaction.

## FACTS COMMON TO ALL COUNTS

27.    In 1993, Jack Dwyer formed Capital Funding Group to provide a full range of lending, investment banking, administrative services and capital investments for skilled nursing facilities, assisted living facilities and other health care facilities. Through Capital Funding Group and the CFG Entities that he controls, Jack Dwyer has held out Capital Funding Group as a one-stop shop that provides seamless service to the health care community. As his conduct in the present case shows, moreover, Jack Dwyer has routinely ignored the formalities of the CFG Entities, and, irrespective of any specific entity with which one or another of his senior personnel might nominally be associated, Jack Dwyer has assigned tasks to such senior personnel that they

perform as his agents, jointly and severally, and as agents of other, related entities and persons whose interests they advance.

28.    In 2009, Jack Dwyer formed Capital Bancorp as a bank holding company for the purpose of acquiring a state-chartered, federally insured bank that became CFG Bank.  Capital Bancorp has three wholly owned subsidiaries, two of which are CFG Bank and Capital Finance. Jack Dwyer has been Chairman of Capital Bancorp and each of its subsidiaries from their inception.  He holds himself out as the "sole owner" of each of the CFG Entities.

29.    On October 31, 2011, following an investigation by the Federal Reserve and the Maryland Commissioner of Bank Regulation, Capital Bancorp and CFG Bank entered into a Consent Order to avoid the issuance of a notice of charges.  Among other things, the Consent Order:

(A).    Required Capital Bancorp and CFG Bank to adopt a code of ethics and conflicts of interest policy applicable to themselves and their affiliated parties. "At a minimum," the code of ethics was to "[p]rohibit self-dealing by affiliated parties and their related interests, and the advancing of personal, business, or other interests at the expense of [Capital] Bancorp and the [CFG] Bank."

(B).    Required Capital Bancorp and CFG Bank to adopt internal controls "to monitor compliance" with their code of ethics and conflicts of interest policy and to provide "training for all institution-affiliated parties...on a regular basis regarding the code of ethics and conflicts of interest policy."

(C).    Required Capital Bancorp to adopt and submit an acceptable written Plan to repay the Bank all funds improperly received by Capital Bancorp, "its nonbank subsidiary, or any affiliate of the Bank..."

(D).    Required CFG Bank "immediately" to take all necessary steps to correct all violations of law and regulation" cited in the report of the investigation and to "take all necessary steps to ensure the Bank's future compliance with all applicable laws and regulations..."

30.    On or about December 14, 2011, Jack Dwyer acquired a group of twelve skilled nursing facilities in Arkansas and added them to his portfolio of CFG Entities.  Third parties who owned the Arkansas properties leased them to a CFG entity, SLC Operations Master Tenant, LLC ("SLC"), under a master lease and SLC, in turn, subleased each of the properties to a CFG single-purpose entity.  Jack Dwyer, directly or indirectly, owned the majority interests in SLC and the single-purpose entities, and he controlled all of them.  Dwyer installed Reynolds as Manager of SLC, as Manager of each of the single-purpose entities and as Manager of two other limited liability companies (Arkansas SNF Operations Acquisition, LLC and CSCV Holdings, LLC) that were part of Dwyer's indirect ownership and operational structure.

31.    By the summer of 2013, Dwyer determined that he had an urgent need to dispose of six of the Capital Arkansas nursing facilities.  Approximately 75% of those nursing facilities' revenues were comprised of Medicaid payments.  Based on the high reimbursements that those nursing facilities had obtained from the State of Arkansas, Jack Dwyer and his subordinates knew that the State would reset retroactively the level of Medicaid payments to require the six Capital Arkansas Entities to refund as much as $2 million in overpayments.  The reset would occur in 2014.  Under Arkansas law, however, the State would not retroactively reset the payments, or require the refunds, if new operators would take over the facilities at the beginning of 2014.  Jack Dwyer and his subordinates also knew that it was not likely that the six Capital Arkansas Entities could sustain the impact of a reset and that, unless the six facilities were transferred promptly to a

new owner, the facilities would sustain operating losses that would also jeopardize approximately $1.75 million indirectly owned by Jack Dwyer, that the six nursing facilities had escrowed for future rent and capital expenditures.

32.    At Jack Dwyer's direction, employees of the CFG Entities searched for a candidate who could be persuaded to take over the six Arkansas facilities.  Jack Dwyer and the other individual Counter-Defendants knew Barnett and Brint from other transactions.  Barnett and Brint were the operators of two nursing facilities in Tennessee that, since 2010, had been customers of CFG Bank and Capital Finance.  With Jack Dwyer's authority, and, based on information and belief, under his direction, Glen Dwyer, Stein and Reynolds undertook to persuade Barnett and Brint to take the six Arkansas nursing facilities off their hands.

33.    In or about August, 2013, Glen Dwyer contacted Barnett and asked if he wanted to grow his business operation.  In that conversation, and in a second conversation several days later, Glen Dwyer stated that the CFG Entities were divesting themselves of their skilled nursing facilities and that, if Barnett was interested in purchasing some of those facilities, "we have an opportunity" for Barnett to consider.

34.    In the second conversation, Glen Dwyer emphasized that the CFG Entities' divestment plans presented an extraordinary opportunity for Barnett if he were willing to act quickly, and he asked Barnett to attend a meeting to hear a proposal.  Barnett agreed to meet and listen to the proposal.

35.    Glen Dwyer arranged a luncheon meeting for September 10, 2013, at Umi Sake Restaurant in Baltimore County, Maryland.  Glen Dwyer, Reynolds and Bradley Wright met with Barnett.  Wright had previously been a credit manager at CFG Bank and, at the time of the luncheon, he was nominally a portfolio manager at Capital Finance.

14

36.    At the September 10th luncheon meeting, Glen Dwyer, Stein and Wright told Barnett that the CFG Entities had twelve nursing facilities in Arkansas and that the CFG Entities wished to divest themselves of six.  They also told Barnett that, because of his prior, successful relationship with the CFG Entities, and the proximity of his existing operations, Barnett was in a unique position to take advantage of this alleged extraordinary opportunity.

37.    Stressing that it was important to the CFG Entities to divest themselves of the facilities by the end of the year, but not explaining the reasons for their timetable, Glen Dwyer, Stein and Wright, acting in concert, emphasized that the CFG Entities would take the necessary steps to assure the consummation of the transaction by the end of the year.  They also represented that the CFG Entities would make the acquisition effortless for Barnett and would assure his future success and growth.  As they explained and represented, the CFG Entities would assign their rights to the six facilities under an existing master lease, furnish all necessary banking through CFG Bank, provide a revolving line of credit through Capital Finance and provide through Addit all back office functions, including accounts receivable/accounts payable services and all accounting, financial reporting, Medicaid cost reporting and other services necessary for the functioning of a nursing facility in a highly regulated environment.

38.    Glen Dwyer, Reynolds and Wright underscored at this meeting the benefits that Barnett would derive from engaging Addit for back office services.  They said that Addit's services were so important to the future success of the six Arkansas facilities, that the engagement of Addit for an eighteen month period would be a condition of the deal.  At the time that they were imposing these conditions and making these representations, however, they knew, but concealed from Barnett, that Jack Dwyer was planning to uproot Addit from its Indianapolis headquarters and move it to Baltimore where he would merge its operations with those of five other

15

management/back office entities that he would name, collectively, Compass Pointe. They also knew and concealed that the previously separate management/back office entities would attempt to merge their information technology components into a single system.

39. Glen Dwyer, Reynolds and Wright knew that there was a substantial likelihood and probability Addit would not be operational or capable of providing timely and accurate back office services while it would be undergoing its own relocation, transformation and consolidation. And, given the importance of the back office services to the successful operation of nursing facilities, they knew that Barnett would not have been amenable to acquiring the nursing facilities if he had known that he and his business entities would have to take such unpredictable and unnecessary risks.

40. Glen Dwyer, Reynolds and Wright intended that Barnett rely on their representations and concealments. They also knew that their representations about Addit were false, and that their false representations and concealments were material, because competent and timely back office services are critical to the successful operation of nursing facilities, particularly during the first months after change of ownership. In this particular instance, where the Capital Arkansas Entities would not be assigning their accounts receivable, there would be a time lag before Barnett's new entities could begin receiving revenue, and it would be essential for Barnett's new entities to have accurate day-to-day information as to their financial performance and financial condition. Furthermore, under the Arkansas cost-based Medicaid benefits system, the new operations would be required to provide timely and accurate reporting, including mandatory six month cost reports, to the Medicaid authorities to obtain a proper level of reimbursements for the patients' care and to avoid defaults in reporting that would result in State-imposed fines and penalties.

41.     Barnett informed Brint of the proposal and the representations that had been made to him at the Umi Sake luncheon.  Relying upon these representations and upon the non-existence of the facts about Addit that the Counter-Defendants were concealing, Barnett and Brint agreed to pursue the opportunity as presented.

42.     Reynolds promptly prepared a letter of intent ("LOI").  Though dated September 13, 2013, the LOI was not presented until several days later and signed by Brint on September 26, 2013, on behalf of entities to be formed as "new operators." Reynolds signed on behalf of Arkansas SNF Operations Acquisition, LLC, described in the LOI as the "current operator."  A copy of the LOI is attached hereto as Exhibit "A."

43.     Among other things, the LOI provided that, in consideration for the assignment or sublease of the current operator's leasehold interests, the new operators: (a) would pay the current operator $1 million over an eighteen month period as replacement of rent security deposits, and (b) would enter into eighteen-month consulting agreements with Addit to provide back office consulting services for the six facilities.  The LOI further provided that the new operators would conclude due diligence by October 15, 2013 and close on the transaction by November 1, 2013.

44.     Barnett and Brint created the Highlands Parties to acquire the six Capital Arkansas Entities, and, on or about December 31, 2013, they entered into a set of contemporaneous agreements, effective as of January 1, 2014.  The agreements, in their totality, constituted a single transaction for the acquisition, financing and operation of the six Arkansas nursing facilities.  The essential parts of this transaction included: (a) a sublease assignment agreement for the assignment and assumption of subleases to a Highlands Party for each facility; (b) an operations transfer agreement for each facility between each Capital Arkansas single purpose Entity and a Highlands Nursing Facility Entity; (c) an administrative service agreement between each Highlands Nursing

Facility Entity and Addit; (d) depository agreements and other agreements for multiple accounts at CFG Bank in the name of each Highlands Nursing Facility Entity and in the name of Capital Finance; and (e) a credit and security agreement between Capital Finance and the Highlands Nursing Facility Entities, together with a $4.2 million revolving loan note by the Highlands Nursing Facility Entities (later increased) and individual guarantees by Barnett and Brint. (These contemporaneous agreements are sometimes referred to herein, collectively, as the "Transaction Agreements").

45.    Reynolds signed the sublease assignment agreement as Manager of SLC Operations Master Tenant, LLC, the tenant and sublessor, and as Manager of Arkansas Operations Acquisition, LLC, CSCV Holding, LLC, and each of the Capital Arkansas single purpose Entities. Reynolds also signed each of the operations transfer agreements as Manager of each of these same Capital entities.  Reynolds further signed each of the administrative services agreements as Manager of Addit.  Glen Dwyer signed the credit and security agreement as Director of Capital Finance.

46.    Aria was a party to the sublease assignment agreement, and, in that agreement, the landlord and the Capital Arkansas Entities agreed that Aria would be the manager of the Highlands Nursing Facility Entities.

47.    Each of the six operations transfer agreements provided that the transferee Highlands Nursing Facility Entity would reimburse the transferor Capital Arkansas Entity the amount that the transferor had paid the landlord as a security deposit and the amount that the transferor had escrowed for replacement reserves.  The security deposits totaled approximately $1 million and the replacement reserves totaled approximately $750,000.  The Highland Nursing

Facility Entities were to pay the $1,750,000 to the Capital Arkansas Entities over an eighteen month period.

48.    The six administrative services agreements, in combination, authorized and required Addit to provide a wide range of essential services.  A copy of one of the six identical agreements is attached hereto as Exhibit "B."  Among other things, Addit was obligated to:

(A).    Provide, or cause to be provided, information hardware, software and all related services necessary for the operation of the Highlands Nursing Facility Entities.

(B).    Provide, or cause to be provided, appropriate and timely bills for services and materials furnished by the Highlands Nursing Facility Entities.

(C).    Administer, process and collect, on behalf of all Medicare, Medicaid and other receivables owing to the Highlands Nursing Facility Entities.

(D).    Assist in the design and maintenance of billing and collection records.

(E).    Prepare and file, or cause to be prepared and filed, all reports and claims related to the Highlands Nursing Facility Entities' revenue production.

(F).    Supervise and coordinate the banking of all funds received by Addit on behalf of the Highlands Nursing Facility Entities.

(G).    Provide, or cause to be provided, the orderly and timely payment of employee payroll and related employment taxes.

(H).    Supervise, direct and provide the procedures and inputting of information into the accounting systems of the Highlands Nursing Facility Entities

and the keeping of full and accurate books and records by the Highlands Nursing Facility Entities.

(I).    Provide, or cause to be provided, the projection of cash receipts and disbursements for each nursing facility.

(J).    Deliver to each Highlands Nursing Facility Entity, on a monthly basis within 30 days after the end of each month (1) a detailed statement of income and expenses; (2) an aged accounts receivables report; (3) an aged accounts payable report; (4) a bank reconciliation report; (5) a statement of cash flows; and (6) a balance sheet report.

(K).    Provide, or cause to be provided, the preparation of additional reports required by government regulatory and other agencies.

49.    The single transaction included a credit and security agreement. On its face, that agreement shows that it was only part of a single transaction that included the other contemporaneous agreements described herein. For example,

(A).    Section 7.1 of the credit and security agreement provided, *inter alia*, that the obligation of Capital Finance to make the loan was subject to its receipt of the sublease agreements, operations transfer agreements, bank agreements and administrative service agreements. *See also* Annex I and Schedules 4.9 and 8.3 thereto.

(B).    Section 2.9 (a) and (b) required the Highlands Nursing Facility Entities to maintain lockbox accounts at CFG Bank and to execute a deposit account control agreement and a deposit account restriction agreement with CFG Bank and Capital Finance. The flow sheet that accompanied the credit and security

agreement showed that the receivables of each Highlands Nursing Facility Entity would be deposited into one of two lockbox accounts at CFG Bank; that the lockboxes would be swept daily into a Capital Finance account at CFG Bank; and that Capital Finance would disburse funds from its CFG Bank account to operating and payroll accounts of the Highlands Nursing Facility Entity at CFG Bank. Further, § 5.7 prohibited the Highlands Nursing Facility Entities from establishing any other deposit accounts.

(C).    While §§ 4.1 and 4.6 of the credit and security agreement required the Highlands Nursing Facility Entities to provide Capital Finance a variety of monthly financial reports, and to keep books and records that would be available to inspection, § 8.3 required that the Highlands Nursing Facility Entities retain Addit to provide those services.   In fact, § 8.3(a) stipulated that, the administrative services agreements with Addit be maintained "at all times ..." *See also* Schedule 8.3.

(D).    Underscoring that the contemporaneous agreements were part of a single transaction, § 8.3(b) of the credit and security agreement provided that, "Borrowers shall not suffer any material breach or default to occur in any of the Borrowers' obligations under any of the Operating Leases, Administrative Services Agreements or Operations Transfer Agreements, nor suffer or permit the same to terminate by reason of any failure of any Borrower to meet any requirement thereof."

50.    From the standpoint of the CFG Entities, the Transaction Agreements had a common goal, *i.e.*, to  enable Jack Dwyer to divest himself of the six Arkansas nursing facilities

and to derive the financial benefits that would flow from the return of the $1.75 million of rent escrows and capital expenditure reserves. Each CFG Entity, including CFG Bank, conditioned its agreement to provide property, services or funds, on the willingness of the Highlands Parties and their owners to enter into all of the agreements. CFG Bank not only provided depository services to facilitate the transaction but also furnished the funds that Capital Finance would use for the revolving line of credit. The Counter-Defendants accomplished the transaction by these multiple acts of self-dealing and conflicts-of-interest and in breach of the fiduciary duties of loyalty and honesty that Jack Dwyer owed to CFG Bank.

51.    The nature and circumstances of the dealings between the Counter-Plaintiffs and the Counter-Defendants were such that, at all times during the negotiation and execution of the Transaction Agreements, a special relationship existed between the Counter-Plaintiffs and the Counter-Defendants. This special relationship gave rise to the duty on the part of each of the Counter-Defendants to disclose to Counter-Plaintiffs their plans to relocate and reorganize Addit so as to permit the Counter-Plaintiffs to assess for themselves the substantial risks of agreeing to allow Addit to have so much control over the vulnerable Highlands Parties at a time when Addit would be relocating its entire operation and undergoing a dramatic and untested overhaul. The Counter-Defendants not only failed to disclose this material information but also actively concealed it.

52.    Throughout the negotiation of the Transaction Agreements, Glen Dwyer, Reynolds and Finbar Scully (of Capital Senior Ventures and, at all relevant times, also a Director of Capital Funding Group) repeatedly extolled the virtues and effectiveness of Addit. They stressed that Addit was familiar with the Arkansas regulatory environment, had a thorough knowledge of the Arkansas Medicaid program, had robust accounting capabilities and could accomplish a seamless

22

and effortless transition from the first day that the Highlands Parties would take over the six Arkansas nursing facilities. They made these statements and representations to Barnett and Brint in telephone conversations and in person at an October 2013 meeting of the National Institute Council for Senior Housing ("NIC") at the Sheraton Hotel in Chicago, Illinois.

53. Glen Dwyer, Reynolds and Scully knew that their representations were false, and that their representations and concealments were material, for the same reasons averred in paragraphs 38, 39 and 40 above.

54. Justifiably relying upon these representations, upon the representations that the Counter-Defendants had made at the Umi Sake luncheon, and relying upon the non-existence of the facts about Addit that the Counter-Defendants were concealing, the Counter-Plaintiffs executed the Transaction Agreements as of January 1, 2014, took over the six Arkansas nursing facilities, and, among other things, began making monthly payments toward the $1.75 million reimbursement of rent escrow and expenditure reserves. The Counter-Plaintiffs would never have executed the Transaction Agreements, and would never have taken over the six Arkansas nursing facilities, if they had known that the Counter-Defendants' representations were false or if they had known the facts that the Counter-Defendants concealed.

55. On or about January 1, 2014, as they had planned but had concealed from the Counter-Plaintiffs, Jack Dwyer and his subordinates merged the Addit operations with five other, related management and back office entities and began trading as Compass Pointe. They also moved all of the separate operations from the cities in which they had been operating to temporary housing in Baltimore pending construction of permanent headquarters across the street from the headquarters of the CFG Entities. Addit and the other back office companies attempted to entice employees to Baltimore where they would endeavor to conduct their day-to-day operations on

behalf of nursing facilities while, at the same time, migrating and integrating their multiple and complex information technology systems into a single "Great Plains" program. The attempts to move key personnel were poorly planned and largely unsuccessful; the efforts at integrating the diverse information technology systems were plagued with technical difficulties; and, as any person who knew of the plan to merge the operations could reasonably have anticipated, Addit found itself unable to provide reliable and timely back-up services to the vulnerable Highlands Parties in the midst of all of Addit's turmoil.

56.    The turmoil at Addit was so disabling that Addit, from the very outset, failed to provide the services that it had promised to supply to the Highlands Parties. Addit's breaches were so immediate and long-lasting that, to this day, Addit has never even produced closing financial statements for 2013 or opening financial statements for 2014.

57.    At all relevant times, both before and after the execution of the Transaction Agreements, the Counter-Defendants knew, and by the exercise of ordinary care would have known, that: (a) accurate and timely back office services were critical to the operation of the six Arkansas nursing facilities; (b) without accurate and timely back office services, the six Arkansas nursing facilities could not be effectively or profitably operated; (c) without accurate and timely back office services, the Highlands Parties could not provide reliable financial statements or other financial information to directors, officers, and employees who needed them; (d) without accurate and timely back office services, cost reports mandated by the State of Arkansas could not be filed; (e) if cost reports were not timely filed with the Arkansas authorities, Arkansas would impose fines and financial penalties; and (f) if cost reports continued to be delayed, Arkansas would reduce its Medicaid reimbursement rates for the six Arkansas facilities, or suspend their participation altogether, until such reports were filed.

58.     By April, 2014, the first quarter of operations had gone by without Addit having performed its billing collection, accounting or other back office duties.  While in California at a Capital Funding Group client appreciation event, Barnett and Brint complained to Reynolds about Addit's continued failings to perform under its administrative services agreements.  On April 30, 2014, Brint, on behalf of the Highlands Parties, sent a letter of default to Addit, Exhibit "C" hereto, explaining dissatisfaction with Addit's lack of performance and calling for partial termination.

59.     On May 1, 2014, in an effort to permit Addit to cure its default, Barnett and Brint met with Reynolds at Capital Funding Group's Baltimore County headquarters.  Reynolds introduced Jerry Kemper and David Merrill as new Addit personnel who would fix the problems.  These new Addit employees found the problems at Addit so intractable that they too soon departed.

60.     In what had become a revolving door, other Addit employees, such as Maggie Harvey and Thomas Paget, came and went.  The cumulative effort of this continuing upheaval was that Addit increasingly failed to perform the Highlands Nursing Facilities Entities' back office functions and Addit fell further behind in the accounting and reporting that was essential to the Highlands Nursing Facilities Entities' continued viability.

61.     Addit's accounts receivable collection and payroll processing functions were so deficient that the Highlands Parties were forced to terminate those functions as of June 30, 2014.  The Highlands Nursing Facility Entities lost receivables that were otherwise collectible and, without adequate revenue, were forced to draw more heavily on their revolving line of credit.

62.     The Counter-Plaintiffs could not, however, extricate themselves from the Counter-Defendants' insistence that the Highlands Nursing Facility Entities continue using Addit's other back office, accounting and reporting services.  Addit still did not provide any accurate financial information or reports that the Highlands Parties could utilize.  As a result of Addit's continued

failures, however, the Highlands Nursing Facility Entities were unable to provide cost reports and other information to meet two important Arkansas deadlines.  Addit's default prevented the Highlands Nursing Facility Entities from filing the necessary information for their August 16, 2014 annual Medicaid rate reset or the September 15, 2014 deadline for filing cost reports for the first six month period (January 1, 2014 through June 30, 2014) during which the Highlands Nursing Facility Entities were the new owners.

63.    At the NIC conference in Chicago in October 2014, Barnett and Brint complained to Reynolds about Addit's continued default of its obligations to provide financial statements and its untimely reporting of its billing and collection efforts.  They emphasized the Counter-Plaintiffs' need for financial information and reports going back to January 1, 2014.  They restated what Reynolds already knew, namely, that the information was solely in the possession of Addit and the Counter-Plaintiffs had no other way of getting it.

64.    Barnett and Brint also experienced an uncomfortable dinner at the 2014 NIC conference with Reynolds and representatives of Omega Health Care Investors (the landlords of the six Arkansas facilities).  Prior to the dinner, Reynolds implored Barnett and Brint not to tell Omega that there were any problems with Addit and not to make Omega aware that the Counter-Plaintiffs had their hands tied because Addit had yet to furnish any reliable financial information.  Relying on Reynolds' further assurance that Addit was about to remedy its defaults, neither Barnett nor Brint complained to the landlords.

65.    On or about October 28, 2014, the Arkansas Department of Human Services began imposing $250.00 monthly fines on each of the Highlands Nursing Facility Entities "for failure to submit the cost report in a timely manner ... for the period of January 2, 2014 through June 30,

2014." The Counter-Plaintiffs informed the Counter-Defendants of the action taken by the Arkansas authorities.

66.     In November 2014, at Barnett's insistence, Jack Dwyer and Glen Dwyer met with Barnett and Brint in Jack Dwyer's office.  Barnett and Brint recounted the history of Addit's disastrous performance and the devastating effect that it was having on the Counter-Plaintiffs.  The Dwyers did not dispute any of the facts regarding Addit's failures or the fact that those failures were ruining the Counter-Plaintiffs' businesses.  Jack Dwyer agreed with the suggestion of Barnett and Brint that new accountants and supporting personnel hired by Aria would take over the Highlands Nursing Facility Entities' accounting reporting and back office functions at the end of the year.  He also assured Barnett and Brint that Addit would finally perform its back office services for 2014.

67.     On or about December 22, 2014, the Arkansas Department of Human Services fined each of the Highlands Nursing Facility Entities $500 "for failure to submit the cost report in a timely manner...for the period of July 1, 2013 through June 30, 2014."  This new action indicated that Addit had not only failed to provide information for the period that the Highlands Parties operated the six Arkansas nursing facilities but that they had also failed to do so during the last six months that the Counter-Defendants controlled and operated the six Arkansas facilities.

68.     By December 31, 2014, however, Addit had done nothing to remedy the situation. Accordingly, Brint, on behalf of the Counter-Plaintiffs, sent a letter, Exhibit "D" hereto, to the CFG Entities and, also, to Jack Dwyer and Glen Dwyer.  The letter pointed out some of the "significant concerns" that the Counter-Plaintiffs had previously shared with the Counter-Defendants and the fact that the Counter-Plaintiffs "have not been able to obtain sufficient or timely financial/billing information to address these various concerns ..."  The Counter-Plaintiffs

stated that they were reserving all of their existing rights under the Transaction Agreements but "will diligently work with you to address any existing concerns, and ensure that full information has been shared."

69.     By February 2015, however, it appeared that Jack Dwyer had made only empty promises.  On February 9, 2015, Arkansas fined each of the Highlands Parties another $500 for the increasingly late filing of the cost reports for the period from January through June 2014. Barnett, Brint and Aria's newly-created back office services departments made multiple calls to Addit's financial services team in an effort to work through the delinquencies but the calls yielded only minimal results.

70.     On or about March 25, 2015, Barnett and Brint made an unannounced visit to Capital Funding Group's headquarters.  The Highlands Parties were in crisis.  The State of Arkansas, having already imposed multiple fines for the late filing of reports, was certain to impose further fines, reduce the levels of its Medicaid reimbursements or suspend or terminate Highlands' participation in the Medicaid program.  Glen Dwyer claimed to be unavailable, but Bradley Wright brought Barnett and Brint to his office where they were joined by Stein and Scully.

71.     Barnett and Brint stated that they had traveled to Baltimore to emphasize that no progress had been made since the meeting with Jack and Glen Dwyer and to share their concern that the State of Arkansas would escalate its actions in light of the fines that the State had already levied.  They added that it was foreseeable that Arkansas would suspend the Highlands Nursing Facility Entities from the Medicaid program if it did not soon receive the cost reports for which only Addit could provide the information.  Scully stated that Reynolds would have to take charge of the process so that Addit could get the necessary reports prepared once and for all.

72.     On March 30, 2015, Brint and Brian Davidson ("Davidson") (a consultant to the Highlands Parties) met with Reynolds and Adrienne Crutch ("Crutch") of Addit.  Crutch explained that she was Addit's new Controller (the fourth or fifth since the Highlands Entities had acquired the Arkansas facilities) and that she and her staff would work on opening entries, as of January 1, 2014, in order to create opening financial statements from which the other statements and cost reports would flow.  Reynolds and Crutch agreed to participate in group conference calls with Aria's newly-hired accounting personnel.  Brint stressed again the need for prompt action because of the fines that the Highlands Nursing Facility Entities had already received and the very real prospect of further penalties and suspension from the Arkansas Medicaid program.  It was apparent to Brint and Davidson that, despite all the months that had passed, Addit had done so little that there was no way for the Counter-Plaintiffs to predict when the information might become available.

73.     On March 31, 2015, Barnett sent a letter to Reynolds, Exhibit "E" hereto, with copies to Jack Dwyer, Glen Dwyer, Stein and Scully, describing the dire situation that their continuing default had created for the Counter-Plaintiffs.  Barnett referred to the Counter-Plaintiffs' many unsuccessful efforts, over a sixteen-month period, to get Addit to perform.  He reviewed the previous communications in which the Counter-Plaintiffs "notified you of the missing reports, statements and other deliverables and the other defaults by Addit under the Administrative Services Agreement."

74.     In his March 31st letter, Barnett also described the injuries that the Counter-Plaintiffs had suffered, and were continuing to suffer, "directly related to Addit's continuing defaults."  These included (i) the lack of credible information to assess the Highlands Nursing Facility Entities financial status, (ii) imminent danger of losing Medicaid revenue for failure to file

the first six-month cost reports, (iii) potential Medicaid paybacks and (iv) an imminent liquidity crisis.  Barnett listed the missing reports, statements and other deliverables, and he emphasized that "it is imperative that we receive the ... information, reports and data required by [Arkansas] immediately."

75.    On or about April 9, 2015, as the Counter-Plaintiffs had warned, the Arkansas Department of Human Services sent identical letters to each of the Highlands Nursing Facility Entities, a copy of one of which is attached hereto as Exhibit "F."  The letters, which were received several days later, stated that Arkansas was reducing the per diem Medicaid rate paid to the Highlands Nursing Facilities Entities until they provided the overdue cost reports for the first six months of 2014.  The letters recited that the Highlands Nursing Facility Entities were paid provisional Medicaid rates starting on January 1, 2014; that cost reports for the first six months of operations, even allowing for extensions, would have been due October 15, 2014; and that the Highlands Nursing Facility Entities had now operated the Arkansas facilities for fifteen months under provisional rates without submitting cost reports essential to establishing new rates.  As a remedy for these failures, the letters stated, Medicaid was reducing the patient per diem rate to $140.50 per day, the lowest provider rate in the Medicaid program, until the cost-based rates could be established from the delinquent and yet unfiled cost reports.  The effect of these letters was to reduce significantly the reimbursement rates that had previously been as high as $192.47 per day and had averaged approximately $190.00 per day.

76.    The reduction in Medicaid reimbursement rates, though curable by the filing of the cost reports, immediately reduced the Highlands Parties' cash flow.  Davidson promptly informed Reynolds and repeatedly pressed Reynolds to provide the information necessary for the higher, previous and correct rates to be restored.  In multiple conversations between April and August

2015, and at a meeting on April 24, 2015, Davidson discussed with Reynolds the fact that the penalty rates were interfering with the Highlands Nursing Facility Entities' ability to make lease payments and impeding their Highlands Parties' ability to pay their vendors.

77.    In the course of his many conversations with Reynolds after the imposition of the Arkansas Medicaid penalty rate, Davidson continually implored Reynolds and his staff to provide the financial information necessary for the filing of the cost reports.  Addit employees scheduled, but then canceled, meetings with Aria's accounting personnel.  Finally, as Addit's eighteen-month contract was coming to an end, Reynolds admitted to Davidson that Addit simply did not have the necessary cost report information and would never be able to supply it.

78.    In May and November 2015, Brint and Stein discussed the Arkansas penalty rates and their effect on the operations and cash flow of the Highlands Nursing Facility Entities.

79.    On August 14, 2015, Capital Finance provided a temporary increase in the revolving line of credit so that the Medicare contracts for the six nursing homes could be put in the names of the Highlands Parties.  The real benefit of this transition was that, if the six Arkansas facilities were to be taken over by another operator, the new operator could immediately receive Medicare reimbursements.  The temporary increase was promptly repaid from Medicare funds.

80.    The Highlands Nursing Facility Entities, deprived of adequate revenue, were soon on the edge of collapse.  Knowing that Addit's failures had effectively destroyed a significant portion of the Highlands Nursing Facility Entities' cash flow, Reynolds used the Highlands Nursing Facility Entities' rent escrows and cannibalized the Highlands Nursing Facility Entities' Medicare receivables to make the lease payments to SLC Operations Master Tenant.  Reynolds, and later Stein, assumed control of the Highlands Nursing Facility Entities' accounts payable while

Stein, Reynolds and the other Counter-Defendants searched for new operators to take over the six Arkansas facilities.

81.     In late October 2015, the Counter-Defendants identified a new operator, Southern Administrative Services ("SAS").  The Counter-Defendants insisted that the Highlands Parties cooperate in transitioning the six Arkansas facilities to SAS.  On November 1, 2015, the Highlands Parties and SAS filed documents with the State of Arkansas for changes of ownership that would take place as of December 1, 2015.  Throughout November, Capital Finance made advances on the existing revolving line of credit, and it controlled the payments to vendors, so that the six Arkansas nursing facilities would still be in operation when they were taken over by SAS.  On December 1, 2015, SAS began operating the facilities.

82.     Counter-Plaintiffs had no incentive to continue operating the six Arkansas nursing facilities after November 1, 2015.  As an inducement to the Counter-Plaintiffs to continue their operation of the six Arkansas nursing facilities, Reynolds represented that Capital Funding Group would reimburse Counter-Plaintiffs for their November expenses.   Acting in reliance upon Reynolds' representation, the Counter-Plaintiffs continued to operate the six Arkansas nursing facilities and incurred costs and expenses in doing so.  Capital Funding Group then refused to reimburse Counter-Plaintiffs.

83.     As a direct and proximate result of the acts, omissions, breaches of contract and violations of the Bank Holding Company Act alleged in this Counterclaim, the Counter-Plaintiffs suffered losses and damages, including, but not limited to: (i) fines and penalties paid to the State of Arkansas; (ii) lost revenues from the State's imposition of a penalty Medicaid reimbursement rate; (iii) lost revenues due to Addit's failure to bill and collect from Medicaid through June 2014 and from Addit's failure to bill and collect from Medicare and third party payers through June

2015; (iv) lost fair market value of the Highlands Nursing Facility Entities; (v) lost profits for the duration of the terms of the subleases; (vi) lost payments for reimbursement of rent escrows and capital reserves; (vii) costs, expenses and obligations incurred by operating the six Arkansas nursing facilities through November 2015; (viii) management fees lost by Aria for the duration of the subleases; (ix) lost rent escrows; (x) accounting and other expenses to perform back office services that Addit had contracted to perform; (xi) debts to trade creditors; and (xii) exposure to claims by creditors and the Counter-Defendants. Counter-Plaintiffs' actual damages are in excess of $15 million.

## COUNT I
### (Intentional Misrepresentation)

84.    The Counter-Plaintiffs incorporate herein the averments of the preceding paragraphs as if the same were set forth and explicitly averred herein.

85.    The Counter-Defendants made false representations of material facts to the Counter-Plaintiffs, as averred in paragraphs 3, 35 through 40 and 52 above.

86.    The Counter-Defendants knew that their representations were false as averred in paragraphs 38 through 40 and 53 above.

87.    The Counter-Defendants made the false representations for the purpose of defrauding the Counter-Plaintiffs, as averred in paragraph 40 above.

88.    The Counter-Plaintiffs justifiably relied upon the Counter-Defendants' false representations and entered into the Transaction Agreements, as averred in paragraph 54 above.

89.    The Counter-Plaintiffs suffered injuries and damages as a direct and proximate result of their reliance on the representations, as averred in paragraphs 6, 8, 74 through 76, 80, 82 and 83 above.

WHEREFORE, Counter-Plaintiffs request that this Court grant them the following relief against the Counter-Defendants:

(a)    judgment for compensatory damages, including pre-judgment interest; and

(b)    judgment for punitive damages as the circumstances warrant; and

(c)    such further relief, including costs, interest, and attorneys' fees, as the Court may deem fit and proper.

### COUNT II
**(Intentional Concealment and Nondisclosure)**

90.    The Counter-Plaintiffs incorporate herein the averments of preceding paragraphs 1 through 83 as if the same were set forth and realleged herein.

91.    Under the circumstances present here, a special relationship existed between the Counter-Plaintiffs and Counter-Defendants while they were negotiating and executing the Transaction Agreements, as averred in paragraph 51 above.

92.    Under the circumstances present here, and because of the special relationship, the Counter-Defendants had the duty to disclose their plans to relocate and reorganize Addit, as well as the risks and probabilities that Addit would not be able to perform the vital administrative and back office services enumerated in the administrative services agreements, as averred in paragraphs 4, 38 through 40 and 51 above.

93.    The Counter-Defendants intentionally concealed from the Counter-Plaintiffs, and failed to disclose, their plans for the relocation and reorganization of Addit, as well as the risks and probabilities that Addit would not be able to perform the vital administrative and back office services enumerated in the administrative services agreements, as averred in paragraphs 38 through 40 and 53 above.

94.     The Counter-Defendants intended to deceive the Counter-Plaintiffs in that they knew that the Counter-Plaintiffs would not have entered into the Transaction Agreements if they had known the facts that the Counter-Defendants concealed and failed to disclose.

95.     The Counter-Defendants, justifiably relying upon the non-existence of the concealed and undisclosed facts, entered into the Transaction Agreements.

96.     As a direct and proximate result of the Counter-Defendants' concealment and nondisclosure, the Counter-Plaintiffs suffered the injuries and damages averred in paragraphs 6, 8, 74 through 76, 80, 82 and 83 above.

WHEREFORE, Counter-Plaintiffs request that this Court grant them the following relief against the Counter-Defendants:

(a)     judgment for compensatory damages, including pre-judgment interest; and

(b)     judgment for punitive damages as the circumstances warrant; and

(c)     such further relief, including costs, interest, and attorneys' fees, as the Court may deem fit and proper.

## COUNT III
### (Negligent Misrepresentation and Nondisclosure)

97.     The Counter-Plaintiffs incorporate herein the averments of preceding paragraphs 1 through 83 as if the same were set forth and realleged herein.

98.     Under the circumstances, the Counter-Defendants, owing duties of care to the Counter-Plaintiffs, negligently asserted false statements of material facts to the Counter-Plaintiffs and negligently failed to disclose material facts, as averred in paragraphs 3, 4, 35 through 40, 51 and 52 above.

99.     The Counter-Defendants intended that the Counter-Plaintiffs act or rely upon the Counter-Defendants' assertions and nondisclosure.

100.    The Counter-Defendants knew that the Counter-Plaintiffs would probably rely upon the Counter-Defendants' assertions and statements, and upon the non-existence of the undisclosed facts, which if negligently stated or negligently omitted, would cause injuries and damages to the Counter-Plaintiffs.

101.    The Counter-Plaintiffs justifiably relied upon the Counter-Defendants' assertions and upon the non-existence of the undisclosed facts, and entered into the Transaction Agreements, as averred in paragraph 54 above.

102.    The Counter-Plaintiffs suffered injuries and damages as a direct and proximate result of their reliance on the false assertions of fact that the Defendants negligently made, and upon the non-existence of the facts that the Counter-Defendants negligently failed to disclose, as averred in paragraphs 6, 8, 74 through 76, 80, 82 and 83 above.

WHEREFORE, Counter-Plaintiffs request that this Court grant them the following relief against the Counter-Defendants:

(a)    judgment for compensatory damages, including pre-judgment interest; and

(b)    such further relief, including costs, interest, and attorneys' fees, as the Court may deem fit and proper.


## COUNT IV
### (Breach of Contract/Highlands Nursing Facility Entities/Addit)

103.    The Highlands Nursing Facility Entities incorporate herein the averments of paragraphs 1 through 83 above as if the same were set forth and specifically averred herein.

104.    On or about December 31, 2013, the Highlands Nursing Facility Entities, Counter-Plaintiffs, entered into administrative services agreements with Counter-Defendant in the same form as Exhibit "B" hereto.

105.    Counter-Defendant Addit undertook the contractual obligations set forth in the administrative services agreements as set forth in Exhibit "B" and as averred in paragraph 48 above.

106.    Counter-Defendant Addit committed material breaches of the administrative services agreements as averred in paragraphs 5, 6, 55 through 63, 68 through 78 above.

107.    None of the Highlands Nursing Facility Entities committed breaches of the administrative services agreements.

108.    As a direct and proximate result of Addit's breaches, the Highlands Nursing Facility Entities suffered the injuries and damages averred in paragraphs 6, 8, 74 through 76, 80, 82 and 83 above.

WHEREFORE, the Highlands Nursing Facility Entities, Counter-Plaintiffs, request that this Court grant them the following relief against Counter-Defendant Addit:

(a)    judgment for compensatory damages, including pre-judgment interest; and

(b)    such further relief, including costs, interest, and attorneys' fees, as the Court may deem fit and proper.

### COUNT V
**(Prohibited Tying Arrangements – Bank Holding Company Act)**

109.    The Counter-Plaintiffs incorporate herein the averments of paragraphs 1 through 83 above as if the same were set forth and specifically averred herein.

110.    CFG Bank is a "bank" within the meaning of the Bank Holding Company Act, 12 U.S.C. § 1971 et seq. and the incorporated definitions of 12 U.S.C. § 1841.

111.    CFG Bank is an "affiliate" of Capital Finance, and both are subsidiaries of Capital Bancorp, a "bank holding company" within the meaning of these statutes.

112.    Each of the other Counter-Defendants is an "institution-related party" within the meaning of these statutes.

113.    Each of the Counter-Plaintiffs was a "customer" of CFG Bank within the meaning of these statutes.

114.    In the single transaction at issue in this case, CFG Bank extended credit and furnished services on the condition that the Highlands Nursing Facility Entities (i) obtain additional credit and services from "Capital Finance," (ii) obtain subleases from the institution-related entities that were the lessees of the six Arkansas Facilities, (iii) enter into operating transfer agreements with institution-related parties, (iv) pay approximately $1.75 million for the benefit of institution-related parties, and (v) utilize the services of Addit, an institution-related party.

115.    The Transaction Agreements, in combination, constituted unusual, unacceptable and prohibited tying arrangements by CFG Bank because, among other things: (i) Jack Dwyer caused CFG to participate in the transaction in breach of his fiduciary duties to CFG Bank; (ii) the transaction resulted in pecuniary gain and other benefits to Jack Dwyer and the other institution-related parties; (iii) the transaction was accomplished through self-dealing, conflict of interest and fraud; and (iv) the tying arrangements were anti-competitive.

116.    The Counter-Defendants other than CFG Bank are institution-related parties who knowingly caused the bank to engage in the violation of § 1972, committed or participated in breaches of fiduciary duty owed to CFG Bank and knowingly caused Jack Dwyer and other institution-related parties to obtain substantial pecuniary gain and other benefits by reason of such violation and breach of fiduciary duties.

117.    As averred in paragraphs 6, 8, 74 through 76, 80, 82 and 83 above, Counter-Plaintiffs were injured in their business and property by reason of the prohibited tying transactions and other misconduct forbidden in 12 U.S.C. § 1972.

WHEREFORE, Counter-Plaintiffs request that this Court grant them the following relief against the Counter-Defendants:

(a)    a judgment three times the amount of the damages sustained by Counter-Plaintiffs and the cost of suit, including reasonable attorneys' fees; and

(b)    such further relief, including interest, as the Court may deem fit and proper.

## DEMAND FOR JURY TRIAL

Defendants/Counter-Claimants request and demand a jury trial on all issues triable by jury.

 

_____
/s/

Arnold M. Weiner (Bar No. 01605)
Michael D. Berman (Bar No. 3010)
Barry L. Gogel (Bar No. 25495)
Rifkin Weiner Livingston, LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD  21211
Telephone: (410) 769-8080
Facsimile: (410) 769-8811
aweiner@rwlls.com
bgogel@rwlls.com
mberman@rwlls.com

Attorneys for Defendants

Date: September 26, 2016